IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY VLAIKU, SR., | ) | CASE NO. 5:07 CV 2780 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **REPORT AND RECOMMENDATION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Timothy Vlaiku, Sr.'s ("Plaintiff") application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

# I. <u>PROCEDURAL HISTORY</u>

On January 12, 2004, Plaintiff filed an application for Disability Insurance benefits, alleging disability beginning December 19, 1995[1] due to limitations related to arthritis. fibromyalgia, sleep apnea, prior back and neck injuries, headaches, and ankle, wrist, neck, shoulder, back and arm pain. The Social Security Agency denied Plaintiff's application initially and upon reconsideration and Plaintiff requested a hearing. On January 9, 2006, Administrative Law Judge ("ALJ") Edward Steinman determined that Plaintiff was not disabled. (Tr.115-16). The Appeals Council granted Plaintiff's request for review, vacated ALJ Steinman's decision and remanded the matter to ALJ Peter Beekman for further proceedings. On February 22, 2007, following the second hearing, ALJ Beekman found that Plaintiff retained the residual functional capacity ("RFC") to perform a range of light work. In light of Plaintiff's RFC and vocational profile, ALJ Beekman found that there were a significant number of jobs that he could perform and that he was, therefore, not disabled.

On appeal, Plaintiff claims that ALJ Beekman's findings are not supported by substantial evidence, that he failed to accord controlling weight to the opinions of Plaintiff's treating physicians, and that he failed to properly evaluate Plaintiff's credibility.

## II. <u>EVIDENCE</u>

### A. **Personal and Vocational Evidence**

Born on March 20, 1955 (age 51 at the time of the ALJ's determination), Plaintiff is an "individual closely approaching advanced age." *See* 20 C.F.R. §§404.1563, 416. 963. Plaintiff obtained his GED in 1982 and has past relevant work as a welder (Tr. 179-199). After working

---

[1] Plaintiff later alleged that he became disabled on February 14, 2003.(Tr. 6, 180).

as a welder, Plaintiff worked for another five and a half years as a truck driver until February of 2003, when he could no longer continue driving due to the pain, headaches and dizziness caused by his sleep apnea and fibromyalgia (Tr. 65-66, 181).

Plaintiff's daily activities included stretching, walking on a treadmill, visiting a nursing home and watching television (Tr. 209, 212).  He was able to do laundry, drive, shop for groceries, wash dishes, and mow grass with a riding mower (Tr. 211).  Plaintiff visited his father-in law in a nursing home four to six days each week and visited his own parents one or two days each week (Tr. 212).

### B.  Medical Evidence

<u>Pre-Onset Impairments</u>

The record reflects that Plaintiff injured his neck in 1989 while working as a welder (Tr. 324).  Plaintiff also injured his lower back while working as a welder in March of 1992 (Tr. 314). Thereafter, Plaintiff received physical therapy and visited a chiropractor through July of 1993 (Tr. 287-322).  Plaintiff was diagnosed with fibromyalgia in 1992. (Tr. 324).

A bone spur was removed from Plaintiff's right shoulder with arthroscopic surgery in 2000 (Tr. 324, 333-38).  Plaintiff's shoulder healed well after the surgery, but, by 2002, Plaintiff was complaining of pain flare-ups in both shoulders (Tr. 333).  X-rays showed significant decompression to the right shoulder and a clavical spur on the left shoulder, and Plaintiff received injections to his shoulders (Id.).

In October of 2001, after a sleep test was performed at Alliance Community Hospital, Plaintiff was diagnosed with severe obstructive sleep apnea and a BiPAP machine was prescribed (Tr. 324, 413-14).

<u>Plaintiff's Primary Care Physician – Dr. John E. Thompson</u>

Plaintiff has been treating with internist Dr. Thompson since at least 200. (Tr. 359).  On February 14, 2003, Plaintiff presented to Dr. Thompson with an emergency: Plaintiff advised Dr. Thompson that he had quit his job due to excessive stress, but now he was concerned that new stress might result from unemployment (Tr. 374).  Dr. Thompson advised Plaintiff not to take any stress medication and to return for his next regularly scheduled appointment to follow-up (Id.).

On March 26, 2003, Plaintiff returned to Dr. Thompson complaining of continued sleep difficulties despite treatment with a BiPAP machine (Tr. 372).  Dr. Thompson diagnosed sleep apnea, insomnia and anxiety (Id.).  He referred Plaintiff to an ear, nose and throat specialist to evaluate surgical treatments and prescribed Ativan for Plaintiff's anxiety (Id.).  Dr. Thompson also referred Plaintiff to a neurologist, Dr. Muhammed Syed, M.D., who confirmed the diagnosis of obstructive sleep apnea and added insomnia and fibromyalgia (Tr. 323-26).

On January 1, 2004, Plaintiff complained to Dr. Thompson of generalized muscle aches and pains of the shoulders, neck, arms and legs (Tr. 367).  Dr. Thompson noted that he had already tried Plaintiff on Ibuprofen, Naprosyn, Daypro, Elavil and Serzone without improvement (Id.).  He referred Plaintiff to rheumatologist Dr. Martin for evaluation (Id.).

Plaintiff returned to Dr. Thompson on February 13, 2004 and March 5, 2004 with continued complaints of generalized body aches (Tr. 366).  Dr. Thompson prescribed Neurontin to address Plaintiff's continued pain and sent Plaintiff for MRIs of the shoulder and cervical spine (Tr. 365-66).  An MRI of the shoulder, taken on March 25, 2004, revealed tendinosis

associated with impingement syndrome (Tr. 361).  The MRI of the cervical spine, performed on the same day, revealed minimal C6-C7 disc protrusion effacing the thecal sac (Tr. 363).

On April 1, 2004, Plaintiff complained to Dr. Thompson that the predominant area of his discomfort was his left shoulder (Tr. 365).  Dr. Thompson prescribed Vicodin and referred Plaintiff for physical therapy (Tr. 339, 360).  On May 5, 2004, Plaintiff reported that he was feeling terrible with aches and pains over his entire body (Id.).  Dr. Thompson continued the Vicodin (Id.).

On August 19, 2004, Dr. Thompson noted increasing amounts of trigger point tenderness over the claimant's back, arms, shoulders, chest and legs (Tr. 380).  Dr. Thompson diagnosed fibromyalgia and prescribed Vioxx (Id.).  On October 22, 2004, Dr. Thompson noted that Plaintiff experienced a great deal of subjective pain with any type of physical movement, and he diagnosed moderately severe fibromyalgia (Tr. 379).  Plaintiff also reported that he continued to be unable to use his BiPAP machine for his sleep apnea (Id.).  Instead, he was using Lorazepam to help him sleep (Id.).  On December 10, 2004, Plaintiff was experiencing even more pain upon movement (Tr. 378).  Plaintiff also expressed his frustration that he could no longer work because of his arm and neck pain and headaches (Id.).  Dr. Thompson diagnosed severe fibromyalgia and opined that Plaintiff was unable to work on a regular basis (Id.).  Dr. Thompson added Flexeril to Plaintiff's regimen (Id).

On August 10, 2005 Plaintiff reported a severe flare-up of his fibromyalgia, neck pain, shoulder pain and arm pain (Tr. 392).  Plaintiff also reported that he was not sleeping well and that he was "devastated" about the fact that he could no longer perform any physical type of work (Id.).  Upon examination, Dr. Thompson found that Plaintiff's range of motion was "fair"

and prescribed Cymbalta (Id.).  He opined that Plaintiff is "permanently and totally disabled at this time" (Id.).

On October 18, 2005, Dr. Thompson completed a Multiple Impairment Questionnaire with respect to Plaintiff wherein he diagnosed fibromyalgia, sleep apnea and depression (Tr. 383-390).  Dr. Thompson stated that he had treated Plaintiff every three to six months, most recently on August 10, 2005, but that Plaintiff's symptoms had not improved in the last four years, despite treatment with physical therapy, massage therapy and chiropractic treatment (Tr. 383, 387).  He noted that Plaintiff had multiple trigger points, and that his pain was exacerbated by any physical activity (Tr. 384-85).  Dr. Thompson further noted that Plaintiff suffered from severe fatigue which required a nap every four hours and that Plaintiff also suffered from depression because he could not work and support his family (Tr. 384-88).

With respect to Plaintiff's residual functional capacity ("RFC"), Dr. Thompson opined that Plaintiff could no longer perform even the least demanding work – "sedentary" work. Specifically, Dr. Thompson opined that Plaintiff was able to sit for three hours and stand/walk for two hours in an eight hour workday (Tr. 385).  Further, Dr. Thompson noted that Plaintiff was essentially precluded from grasping, turning and twisting objects, and that he had significant limitations in his ability to reach forward or overhead and to use his fingers for fine manipulations (Tr. 386-87).  Dr. Thompson stated that Plaintiff was only capable of a low stress job in that stress increases Plaintiff's muscle tension and spasms (Tr. 388).  Finally, Dr. Thompson opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment, that his experiences of pain and fatigue were frequently severe

enough to interfere with his attention and concentration, and that he would likely be absent from work more than three times a month as a result of his impairments (Tr. 387-89).

Plaintiff saw Dr. Thompson again on November 10, 2005 (Tr. 382).  At that time, Plaintiff complained that he was having fibromyalgia pain every day and headaches almost every day (Id.).  Plaintiff also noted that he was quite distraught over his situation (Id.).  Upon examination, Dr. Thompson noted multiple trigger points along the arms and neck, as well as diffuse paresthesias of the lower extremities (Id.).  Dr. Thompson diagnosed mildly severe fibromyalgia and prescribed a Prednisone burst and Effexor (Id.).  Dr. Thompson recommended pain management, but Plaintiff indicated that he could not afford it (Id.).

Plaintiff returned to Dr. Thompson on March 22, 2006 (Tr. 408).  He reported that his discomfort had improved with the Cymbalta, but upon physical exertion, intense pain returned. (Id.). Plaintiff also noted moderately severe insomnia (Id.).  Upon examination, Dr. Thompson noted trigger points over Plaintiff's back and arms (Id.).  Dr. Thompson opined that the insomnia was contributing to some of Plaintiff's dysfunctions and dispensed samples of Lunesta (Id.).

On June 6, 2006, Dr. Thompson completed a Rheumatoid Arthritis Impairment Questionnaire wherein he diagnosed Plaintiff with fibromyalgia and sleep apnea (Tr. 396-402). Dr. Thompson indicated that Plaintiff had pain, inflammation and/or limitation in his back, mid-back, lower back, pelvis, right and left shoulders, hips, knees, elbows, and the fingers on both hands (Tr. 396-97).  In terms of clinical findings, Dr. Thompson noted a reduced range of motion in Plaintiff's neck, sensory loss, muscle spasms in Plaintiff's arms, neck and legs, tenderness and trigger points throughout the arms, legs, back, neck, and chest (Tr. 397).  Dr. Thompson noted that Plaintiff's pain is precipitated by repetitive movements, fatigue, and

vibration (Id.).  Dr. Thompson also noted that Plaintiff's chronic pain produced depression and poor sleeping patterns (Tr. 400).

With respect to Plaintiff's RFC, Dr. Thompson again opined that Plaintiff could no longer perform even sedentary work (Tr. 399).  Specifically, Dr. Thompson opined that Plaintiff was able to sit for four hours and stand/walk for four hours in an eight hour workday (Id.).  Dr. Thompson noted that Plaintiff's limitations date back to the mid-nineties and have persisted despite hot tub treatment, physical therapy, massage therapy, and chiropractic treatment. (Tr. 399-402).  Finally, Dr. Thompson noted that "Patient wants to work but that pain prevents gainful employment" (Tr. 402).

Plaintiff was seen by Dr. Thompson on September 6, 2006 (Tr. 407).  Plaintiff complained of headaches and general body aches and his frustration about his inability to work (Id.).  Upon examination, Dr. Thompson noted that Plaintiff shifted positions constantly and had a loss of focus during discussions (Id.).  He also noted multiple trigger points over Plaintiff's back, shoulders, arms, chest, abdomen, and legs (Id.).

Dr. Thompson diagnosed fibromyalgia and substituted Lyrica in place of the now-ineffective Cymbalta (Id.).  Dr. Thompson also recommended trigger point injections and a pain management referral, but Plaintiff indicated that he could not afford such treatment because he had no income and had high co-pays (Id.).  Dr. Thompson opined:

> Patient has [sic] limited in repetitive motions, recurrent. He cannot function on a day to day basis in an efficient manner to be employable. He has 1-2 good days per week. He's not useful for the rest of the time. I believe he is disabled from his fibromyalgia. I informed him that fibromyalgia is one of those difficult to define conditions.... I will support him as being disabled from fibromyalgia.

(Id.).

Plaintiff returned to Dr. Thompson on November 10, 2006, complaining of severe pain, an inability to sleep at night, headaches, back and arm pains, and muscle aches and pains (Tr. 406). Plaintiff stated that he was very frustrated because he wants to work but cannot function two to three days in a row (Id.). Upon examination, Dr. Thompson noted that Plaintiff was moving quite frequently, could not sit still, and was grimacing intermittently (Id.). Multiple trigger points were again noted over the back and extremities (Id.).

Dr. Thompson diagnosed severe fibromyalgia and noted his own frustrations in treating Plaintiff (Id.). Dr. Thompson noted that Plaintiff "has seen multiple individuals in the past for this and we have yet to come up with a viable treatment plan that provide relief for patient" (Id.). Dr. Thompson also noted that the treatments he had prescribed over the years had not provided improvement for Plaintiff's conditions (Id.). Dr. Thompson referred Plaintiff to psychiatry and opined that Plaintiff is "permanently disabled… I'll be surprised if anything further can be done for Mr. Vlaiku" (Id.).

<u>Treating Orthopedic Specialist – Dr. Roger Palutsis</u>

Plaintiff visited Roger S. Palutsis, M.D., for neck and shoulder pain in January 2003 (Tr. 333). A physical examination of Plaintiff revealed limited right lateral rotation of the neck (Id.). Ranges of motion in his neck and shoulders were otherwise unremarkable (Id.). During this visit, Plaintiff showed no signs or weakness or shoulder impingement (Id.). Dr. Palutsis prescribed physical therapy and Plaintiff did not return until later that year (Tr. 331, 333).

In December 2003, Plaintiff returned to Dr. Palutsis for treatment of his left knee, neck and shoulder pain (Tr. 331). Though examination of the knee proved unremarkable, Dr. Palutsis

uncovered positive impingement signs in Plaintiff's left shoulder and tenderness in the shoulder musculature (Id.).  Dr. Palutsis ordered an X-ray, which showed arthritic changes but "wide open" foramina (Id.).  Dr. Palutsis advised Plaintiff to continue with physical therapy and prescribed a course of steroids (Id.).  Plaintiff decided against steroid treatment (Id.).  Plaintiff returned to Dr. Palutsis several days later with complaints of recurring neck and shoulder pain (Id.).  During examination, Plaintiff showed good range of motion in his neck and had "excellent" strength (Id.).  Plaintiff told Dr. Palutsis that he was going to try to start working again as a semi-truck driver (Id.).

In November 2006, Dr. Palutsis prescribed Plaintiff a home traction unit (Tr. 405).  Also in November 2006, Plaintiff saw Dr. Thompson for a follow-up visit (Tr. 406).  Dr. Thompson noted that Plaintiff demonstrated "okay" muscle strength, but that the examination generated pain and produced multiple trigger points over the back and extremities (Id.).  He opined that Plaintiff was permanently disabled and referred him for a psychiatric evaluation (Id.).

<u>Treating Rheumatologist – Dr. David A. Martin</u>

In January 2004, Dr. Thompson referred Plaintiff to David A. Martin, M.D., a rheumatologist (Tr. 347-48).  Dr. Martin's examination confirmed that Plaintiff had "diffuse tenderness suggestive of fibromyalgia" along his back and shoulders and decreased range of motion along his cervical spine (Tr. 348).  Dr. Martin confirmed Plaintiff's diagnosis of fibromyalgia and recommended new sleep patterns to alleviate Plaintiff's diffuse pain and general fatigue (Id.).

In March 2004, an MRI confirmed Plaintiff's shoulder impingement (Tr. 361-62).  An MRI of the cervical spine revealed minimal disc protrusion at C6-7, but was otherwise normal

(Tr. 363).  Plaintiff returned to Dr. Martin after sending him a lengthy note about his health issues and multiple problems in October 2006 (Tr. 404). D r. Martin detected diffuse tenderness consistent with fibromyalgia tender points (Id.).  He recommended Plaintiff get involved in a regular aerobic exercise program (Id.).

Plaintiff's Treating Psychologist

Plaintiff saw psychologist Alice Neuman, Ph.D., periodically from November 2006 to January 2007 (Tr. 424-33).  Dr. Neuman diagnosed moderate, recurrent major depression (Tr. 427).  She noted that he complained of chronic pain, difficulty sleeping, money problems, marital problems, his son's marital problems and the denial of his disability claims (Tr. 427-33). Her records contain no clinical observations concerning Plaintiff's mental status or functioning (Id.). However, in January 2006, Dr. Neuman noted that Plaintiff complained of "extreme pain" and would get up and walk around her office during the forty-five-minute session (Tr. 433).

In January 2007, Dr. Neuman completed a psychiatric impairment questionnaire (Tr. 416-23).  She stated that Plaintiff had moderate, recurrent, major depression, with a "poor" prognosis "unless pain remits" (Tr. 416).  She checked off several clinical signs on the form and rated Plaintiff's ability to engage in twenty work-related areas of mental activities (Tr. 417-21). Dr. Neuman opined that Plaintiff was moderately limited in his ability to carry out one or two-step instructions, mildly limited from interacting appropriately with the general public or adhering to acceptable forms of behavior, and markedly limited from performing more detailed tasks, maintaining a schedule, sustaining an ordinary routine without supervision, or conforming to a normal workweek without interruptions (Id.).  Dr. Neuman indicated that Plaintiff decompensated or withdrew when in pain because he reportedly quit a job operating a snow

11

plow due to pain (Tr. 421).  She opined that Plaintiff was incapable of "low stress" work because he could not sit still and concentrate or remember during treatment sessions with her (Tr. 422). Dr. Neuman stated that she "believe[d] he definately [sic] qualifie[d] for full permanent disability" (Tr. 423).

Consultative Examinations

In June 2004, Michael R. Magoline, M.D., examined Plaintiff at the request of the state agency (Tr. 340-46).  Plaintiff told Dr. Magoline that he had a long history of whole body pain (Tr. 340). Plaintiff reported that the was currently receiving treatment for fibromyalgia and sleep apnea and that he had undergone surgery on his right shoulder in the past (Id.).  Dr. Magoline noted that Plaintiff walked with a normal gait and retained full range of motion in his cervical and thoracic spine, but range of motion was mildly decreased in his lumbar spine (Tr. 341). There were no signs of nerve root tension and spinal lordosis was normal (Id.).  Plaintiff retained full muscle strength and normal sensation and deep tendon reflexes in his upper and lower extremities (Id.).  X-rays of the lumbar spine were normal (Id.).  Dr. Magoline noted that the examination was "essentially normal," and he "would not restrict him from working from an orthopedic standpoint" (Tr. 342).

**C. Hearing Testimony**

Plaintiff's Testimony

Plaintiff quit working in 2003 due to pain and stress (Tr. 65-66).  He would have headaches and become light-headed while driving, and at the time he worked as a truck driver hauling fuel (Tr. 66).  Plaintiff stated that he did not take daily naps, and he did daily stretching

exercises for his fibromyalgia (Tr. 67).  He used Ibuprofen for his pain, and once or twice each week he took Vicodin (Tr. 68).

Plaintiff said he helped with the dishes and the laundry (Tr. 69-70).  He mowed the lawn until the previous year (Tr. 70).  His right shoulder was sore, and he had to move around to relieve the discomfort (Tr. 72).  His hands would become numb after he held them up over his head (Tr. 72).  Plaintiff had aches and pains from his low back down into his legs (Tr. 73).  The top of his feet ached and he had a numb spot on the right leg below the knee (Id.).  He was depressed and cried several times each week (Tr. 74).  He had difficulty focusing and his energy level was not very high (Tr. 75).

Plaintiff estimated that he could only walk one block without stopping to take a break (Tr. 78).  He said he could not sit more than ten minutes before he needed to get up (Id.).  He said he could not lift anything above a ninety-degree angle with his arms extended, but he could lift a gallon of milk (Tr. 79).  He said he could not bend and he could not write for very long because he would get cramps in his hands (Id.).  Plaintiff stated that the longest trip he has taken in the car in the year before the hearing was a seventy mile trip to the hearing itself (Id.).  However, Plaintiff noted that his wife did some of the driving (Id.).

<u>Medical Expert Testimony</u>

Dr. Goren testified at the February 6, 2007, administrative hearing (Tr. 81).  Dr. Goren indicated that Plaintiff had a right shoulder impairment, sleep apnea, an affective disorder and fibromyalgia (Tr. 81-82).  Dr. Goren stated that the proper treatment for fibromyalgia is exercise, such as jogging (Tr. 82).  Dr. Goren stated that Dr. Thompson's opinion that Plaintiff could not withstand sedentary work was not supported by his notes (Tr. 83).  Dr. Goren observed that Dr.

13

Thompson's opinion that Plaintiff could never grasp suggested that he would not be able to feed himself, a conclusion that was not supported by the record (Id.).  He also stated that the severe physical restrictions in Dr. Thompson's opinions were contradicted by Dr. Martin's opinion that Plaintiff needed to engage in regular exercise (Id.).  Dr. Goren opined that Plaintiff's pain was psychogenic, and he questioned Dr. Neuman's opinion inasmuch as she should have been, but was not, treating Plaintiff's complaints of pain (Tr. 84).

Dr. Goren testified that Plaintiff was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently (Id.).  He stated that Plaintiff had no limitations in his ability to stand, walk or sit (Id.).  He could occasionally push or pull overhead with his right hand, but only occasionally reach overhead with his right hand and never climb ladders, ropes or scaffolds (Id.).  Dr. Goren further opined that Plaintiff should not work around moving machinery or unprotected heights, and could not tolerate high production quotas (Id.).  He opined that Plaintiff could tolerate superficial interpersonal interaction with supervisors, co-workers and the general public, but no arbitration, negotiation, confrontation or supervision (Tr. 84-85).

<u>Vocational Expert Testimony</u>

Vocational expert ("VE") Bruce Holderead also testified at the administrative hearing (Tr. 91).  ALJ Beekman asked Mr. Holderead to consider a hypothetical individual who was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently (Tr. 92).  The individual could stand/walk and sit six hours each during an eight-hour work day; only occasionally push, pull or reach overhead; frequently climb ramps and stairs, balance, stoop, kneel and crouch, and feel and handle objects; and never crawl or climb ladders, ropes or

scaffolds (Id.).  The individual should not be exposed to dangerous machinery or unprotected heights; could relate to supervisors, peers and the public; and could follow short, simple instructions (Tr. 93).  The individual had the ability to maintain attention to perform simple, one- or two-step tasks; withstand the stress of daily work activity; remember locations and procedures; perform an ordinary routine independently; make work-related decisions, ask questions or seek assistance; accept instructions or criticism; respond to work changes; travel and use public transportation; and handle superficial interaction with the public, co-workers, and supervisors (Id.).  The person ALJ Beekman described could not remember or carry out detailed instructions; do tasks involving high production quotas or piece work; supervise others; or do tasks involving arbitration, negotiation or confrontation (Id.).  Mr. Holderead identified several jobs the individual could perform including, but not limited to, marker (350 jobs in northeast Ohio), order caller (1,500 jobs in northeast Ohio), and mail clerk (580 jobs in northeast Ohio) (Tr. 94-95).  Mr. Holderead testified that, if the individual required the option to sit/stand at will, he could perform all of the jobs he identified (Tr. 95).

## III.  **DISABILITY STANDARD**

A claimant is entitled to receive Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20. C.F.R. §§ 404.1505, 416.905.

## IV. <u>STANDARD OF REVIEW</u>

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

16

# V.  ANALYSIS

## A.  The ALJ's Treatment of Plaintiff's Treating Doctors

Plaintiff first claims that the ALJ erred by failing to accord controlling weight to the medical opinions of Dr. Thompson, Plaintiff's primary care physician, and Dr. Neuman, Plaintiff's treating psychologist. Plaintiff claims that the ALJ's reasons for rejecting the medical opinions of Dr. Thompson and Dr. Neuman are invalid and insufficient under the current regulations, and therefore are not supported by substantial evidence.

The regulations clearly require a treating physician be given controlling weight should his opinion be well-supported by medically acceptable clinical and laboratory diagnostic techniques. *See* 20 C.F.R. § 404.1527(d)(2). Indeed, the opinion of a treating physician is afforded greater weight than those of physicians who have examined the claimant on consultation or who have not examined the claimant at all. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).  Although the regulations ensure an ALJ is not bound by the opinion of a claimant's treating physician, if he chooses to reject said opinion, the ALJ must articulate good reasons for doing so. *See Shelman*, 821 F.2d at 321.  Specifically, if a treating source is not accorded controlling weight, the ALJ must apply certain factors: (1) the length and frequency of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion, with respect to relevant evidence such as medical signs and laboratory findings;  (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor

raised by the applicant. *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (*citing* 20 C.F.R. § 404.1527(d)(2)-(6)).

### 1. Dr. Thompson

Plaintiff first claims the ALJ erred in his treatment of Dr. Thompson's opinion. Specifically, Plaintiff argues that the ALJ failed to follow the required framework for evaluation of a treating physician's opinion and erred in relying on the lack objective medical evidence to discount Dr. Thompson's opinion.  Plaintiff's claims have merit.

The ALJ failed to properly evaluate Dr. Thompson's opinion under the regulations and the factors set forth in 20 C.F.R. § 404.1526(d)(2)-(6).  The ALJ noted that Dr. Thompson opined Plaintiff could perform work at a less than sedentary level (Tr. 18).  He then stated that he concurred with the ME's testimony that Dr. Thompson's opinion is not supported by the medical evidence of record (Id.).  In support, the ALJ cited records from Dr. Magoline and explained that there is no objective medical evidence to support that Plaintiff is totally limited from pushing pulling, grasping, turning and twisting objects (Id.)  However, the ALJ did "note that Dr. Thompson opined that the claimant could occasionally lift up to 20 pounds" (Id.).  The ALJ provided no other articulation of his analysis of Dr. Thompson's opinion.  Thus, the ALJ clearly failed to articulate what weight, if any, he assigned to Dr. Thompson's opinion.

Because Dr. Thompson opined that Plaintiff could only perform work at less than sedentary level and the ALJ ultimately concluded Plaintiff could perform a range of light work, the ALJ substantially rejected Dr. Thompson's opinion.  An ALJ is required to articulate good reasons for rejecting the opinion of a treating physician and apply the factors set forth in 20 C.F.R. 404.1526(d)(2)-(6).  Application of these factors to the present case demonstrates that

Plaintiff saw Dr. Thompson for frequent examinations over a period of more than four years (Tr. 383).  Plaintiff began seeing Dr. Thompson in at least 2002, and saw Dr. Thompson regularly beginning in early 2003, after Plaintiff could no longer work due to pain and stress (Tr. 359, 374).    Over the course of Plaintiff's treatment, Dr. Thompson consistently diagnosed fibromyalgia and treated Plaintiff for this impairment.  In mid-2003, Dr. Thompson referred Plaintiff to Dr. Syed, who confirmed Dr. Thompson's initial diagnosis of anxiety and added fibromyalgia and insomnia (Tr. 323-26).  Dr. Thompson regularly updated Plaintiff's diagnosis of fibromyalgia, upgrading Plaintiff's condition to severe in December 2004 and reconfirming severe fibromyalgia in November 2006 (Tr. 378, 406).   Each time, Dr. Thompson noted tenderness in multiple trigger points in Plaintiff's arms, shoulders, and back (Id.).   Dr. Thompson's diagnosis was confirmed by Dr. Martin, who also noted diffuse trigger point tenderness during an examination in October 2006 (Tr. 415).   Dr. Thompson prescribed numerous different medications and other treatment in attempt to treat Plaintiff's fibromyalgia and provide relief from his resulting pain.  He prescribed Ativan for Plaintiff's anxiety (Tr. 372).  When Dr. Syed confirmed fibromyalgia, Dr. Thompson tried Plaintiff on Ibuprofen, Naprosyn, Daypro, Elavil and Serzone through 2004, and then Vioxx, Flexeril, Cymbalta, a Prednisone burst, Effexor, and Lyrica through 2006, all without improvement (Tr. 367, 380, 392, 407).  Despite this evidence, the only factor the ALJ considered was the supportability of Dr. Thompson's opinion with respect to objective criteria, such as medical signs and laboratory findings.  The ALJ's reliance on this single factor to reject Dr. Thompson's opinion is insufficient to discharge his duty to articulate good reasons for rejecting a treating source's opinion and is particularly inappropriate in a fibromyalgia case.

The Sixth Circuit has rejected dismissal of a treating physician's opinion in a fibromyalgia case where the sole basis for the dismissal is a lack of objective medical evidence. *Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 2003). Fibromyalgia demands an alternative approach to evaluating limitations caused by the disease because the severity of fibromyalgia cannot be confirmed by objective clinical testing. *Swain v. Commissioner*, 297 F. Supp. 2d 986 (N.D. Ohio 2003). Thus, the ALJ's reliance solely on the absence of objective medical evidence to reject Dr. Thompson's opinion was improper and is not supported by substantial evidence. Plaintiff was diagnosed with fibromyalgia in 1992, after injuring his neck while working as a welder in 1989 (Tr. 324). Over the course of fifteen years, Plaintiff underwent shoulder surgery, used a BiPap sleep machine for his apnea, and took a number of anti-inflammatory prescription medications, including Ibuprofen, Naprosyn, Daypro, Elavin, Serzone and Neurontin (Tr. 365-67). None provided relief for his pain and inflammation. (Id.). Dr. Thompson tried stronger pain medications, including Vicodin, Acetaminophen and Vioxx. (Tr. 360, 380). Dr. Thompson also tried a series of muscle relaxers, antidepressants, and anti-anxiety medications, including Lorazepam, Flexerol and Cymbalta (Tr. 378-90). None provided relief and Plaintiff continued to complain of terrible aches and pains (Id.). Dr. Thompson treated Plaintiff every three to six months over the course of four years, through massage therapy, medication, and chiropractic treatment, yet Plaintiff's symptoms failed to improve (Tr. 383, 387). Dr. Thompson noted that Plaintiff appeared uncomfortable in each of their meetings, some days worse than others (Tr. 406). Plaintiff's pain coincided with the consistent presence of worsening trigger point tenderness, which is the primary diagnostic technique for fibromyalgia. *Preston*, 854 F.2d at 817-18; *Swain*, 297 F.Supp. 2d at 992;

*Green-Younger*, 335 F.3d 99 at 102; *Rogers v. Commissioner of Social Security*, 486 F.2d 234, 244 (6th Cir. 2007).  Dr. Thompson consistently diagnosed Plaintiff with moderate to severe fibromyalgia over the course of four years, and yet the ALJ failed to articulate what weight, if any, he assigned to Dr. Thompson's opinion and give sufficient reasons for not giving Dr. Thompson's opinion controlling weight.  Therefore, the Magistrate Judge holds that the ALJ's decision to discount the opinion of Dr. Thompson is not adequate under the regulations and not supported by substantial evidence.

## 2. Dr. Neuman

Plaintiff argues that the ALJ should have credited Dr. Neuman's opinion that Plaintiff was severely restricted from any physical activity because it is well supported and not inconsistent with medical evidence in the record. The ALJ must provide good reasons applying each of the factors before assigning the opinion of a treating physician less than controlling weight. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988) ("The ALJ may reject a treating source's conclusion concerning a claimant's maximum residual functional capacity when good reasons are identified for not accepting it.").

The ALJ rejected Dr. Neuman's contention that any physical exercise aggravated Plaintiff's ability to concentrate, and therefore he should be limited from physical activity (Tr. 18-19). To support his conclusion, the ALJ considered the nature of Dr. Neuman's treatment as unsupportive of her contention because Dr. Neuman never evaluated Plaintiff during physical activity (Id.). Additionally, the ALJ noted that Dr. Neuman had only treated Plaintiff for three months (Tr. 18).

The ALJ properly evaluated Dr. Neuman's medical opinion using each of the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6) and his treatment of her opinion is supported by substantial evidence. The ALJ reasonably concluded that Dr. Neuman's opinion regarding the Plaintiff's decompensation during physical exercise was based on Plaintiff's subjective statements, not clinical observations, because the treatment record for physical limitations consists of mere recitations of Plaintiff's complaints (Tr. 428-33). The ALJ did not completely reject or ignore Dr. Neuman's conclusions; in fact, the ALJ incorporated into the hypothetical Dr. Neuman's opinion that Plaintiff would require work involving simple tasks and no more than minimal contact with the public (Tr. 16). However, given Plaintiff's infrequent and brief treatment history by Dr. Neuman, and the lack of medical evidence in the record to support Dr. Neuman's opinion on Plaintiff's decompensation, the ALJ's decision is well founded.

Plaintiff also complains that the ALJ erred by rejecting Dr. Neuman's opinion that he Plaintiff qualified for full disability. The ALJ properly noted that a determination of disability is an issue reserved to the Commissioner and not Dr. Neuman. *See Cohen v. Secretary of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) ("Specifically, the ALJ is not bound by a treating source's conclusion concerning a claimant's maximum residual functional capacity, especially when there is substantial medical evidence or other evidence to the contrary."). The ultimate determination of disability is the province of the Commissioner, and therefore, Plaintiff's claim that the ALJ erred in discrediting Dr. Neuman's opinion on full disability is rejected.

**B. Credibility**

Plaintiff next claims the ALJ failed to properly evaluate his credibility.  Plaintiff asserts that the ALJ erred by rejecting his statements regarding his physical limitations.  Plaintiff also asserts that the only specific excuse the ALJ gave for discounting his credibility was the fact that he could still operate a motor vehicle up to a distance of 70 miles, as evidenced by the fact that he had traveled 70 miles to the administrative hearing.  Plaintiff's claims are not well taken.

The Magistrate Judge recognizes that pain alone may be sufficient to support a claim of disability. *See King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).  However, a claimant's subjective assertions of pain, standing alone, will not suffice.  In most disability benefits cases, to find disabling pain, there must be objective evidence of an underlying medical condition and either objective medical evidence *confirming* the severity of the alleged pain arising from that medical condition, or the objectively determined medical condition must be of a severity which can *reasonably be expected* to give rise to the alleged pain.  *See Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986).

The *Duncan* test, however, is not the end of the analysis.  The Commissioner may consider other factors that may or may not corroborate Plaintiff's allegations of pain. *See Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997); *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1986); 20 C.F.R. §416.929(c)(2).  The other factors may include: statements from the claimant and the claimant's treating and examining physicians; diagnosis; efforts to work; the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the

claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky*, 35 F.3d at 1039-40; 20 C.F.R. §§ 404.1529(c) and 416.929(a), (c)(3).  Similarly, the ALJ may take notice of the presence of muscle atrophy, reduced joint motion, muscle spasm, sensory deficits, or motor disruption.

Here, there seems to be no dispute regarding the first prong of the *Duncan* test.  In fact, the ALJ concluded that Plaintiff did, in fact, suffer from fibromyalgia, which he classified as a severe impairment (Tr. 15).  The second element of the Duncan test, however, proves troublesome due to the nature of Plaintiff's impairment.  "Fibromyalgia is an 'elusive' and 'mysterious' disease.  It has no known cause and no known cure.  Its symptoms include severe musculoskeletal pain, stiffness, fatigue, and multiple acute tender spots at various fixed locations on the body." *Swain v. Commissioner of Social Security*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (citations omitted).  However, there is no clinical or laboratory test to determine the existence of fibromyalgia or the severity of the disease. *Id.*  Indeed, examinations typically result in normal findings, including full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions.  *Id.*  Needless to say, with such an elusive disease, there is little to rely upon in measuring the limitations brought on by the resulting pain of the fibromyalgia:

> Because of the nature of fibromyalgia and its manifestations, application of the usual disability analysis is difficult. The first alternative test under the second prong of Duncan – medical evidence confirming the severity of the alleged pain – almost never exists. ...  Analysis is also hampered under the second alternative ... .  In most cases, the analysis under this second alternative test will consist of diagnostic findings confirming the severity of the

> impairment and the opinion of a physician as to limitations that
> pain caused by such severity will impose. Since the presence and
> severity of fibromyalgia cannot be confirmed by diagnostic testing,
> the physician's opinion must necessarily depend upon an
> assessment of the patient's subjective complaints.

*Id.* Upon acknowledgment of the above, it is evident that in cases of claimed disabling pain

caused by fibromyalgia, the assessment of the claimant's credibility is highly significant. *See id.*

Indeed,

> [t]olerance of pain is a highly individual matter and a
> determination of disability based on pain by necessity depends
> largely on the credibility of the claimant. ... It must be kept in mind
> that the determination of credibility related to subjective
> complaints of pain rest with the ALJ and that the ALJ's
> opportunity to observe the demeanor of the claimant ... is
> invaluable and should not be discarded lightly.

*Brazier v. Secretary of Health and Human Servs.*, 61 F.3d 903, 1995 WL 418079, *9 (6th Cir.

July 13, 1995) (Table) (internal citations and quotations omitted).

Despite the elusive nature of fibromyalgia, a claimant seeking benefits due to disabling

pain brought on by the disease still retains the burden of producing evidence other than her

subjective complaints to support her claim of disability. *See Cohen v. Secretary of Health and

Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Additionally, the mere diagnosis of

fibromyalgia is insufficient to render a claimant's complaints of disabling pain credible. *See

Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967); *Brazier*, 1995 WL 418079, at *9.

In determining that Plaintiff's medically determinable impairments could reasonably be

expected to produce the alleged symptoms, but that Plaintiff's statements concerning the

intensity, persistence and limiting effects of these symptoms were not entirely credible, the ALJ

gave detailed consideration to the factors set forth in 20 C.F.R. §§ 404.1529(c) and 416.929(a),

(c)(3). The ALJ considered Plaintiff's daily activities, such as loading the washing machine and dishwasher (Tr. 17).  In evaluating the location, duration, frequency, and intensity of pain or other symptoms, the ALJ recognized that Plaintiff complains of lost sleep, headaches, inability to do more rigorous activity than stretching, and pain radiating down back and legs, and that his hands cramp with activities such as writing and eating (Tr. 17).  The ALJ reasonably discussed Plaintiff's medication and treatment history, including prescribed various anti-inflammatory medications, stronger pain medications, and occasional exercise since the 1990's for his fibromyalgia (Tr. 17-18).   The ALJ also considered Plaintiff's fatigue and decrease in concentration due to his inability to successfully use the Bi-Pap machine (Tr. 18).  The ALJ noted that consultative physician Dr. Magoline found Plaintiff had an essentially normal orthopedic exam  (Tr. 18).  The ALJ also noted the ME's testimony that there was no organic reason for Plaintiff's whole body pain, but that fibromyalgia is a medical impairment that could cause pain (Tr. 18).   And, the ALJ considered the ME's testimony that Dr. Thompson's conclusion Plaintiff can perform at a less than sedentary level is not supported by the medical evidence of record.  For example, the objective medical evidence demonstrates that Plaintiff is fully capable of pushing, pulling, grasping, turning and twisting objects.  In addition, the ALJ noted Dr. Thompson's conclusion that Plaintiff could occasionally lift up to 20 pounds and Dr. Martin's opinion that Plaintiff was capable of a regular exercise program, including the use of a treadmill (Tr. 18-19).

Thus, it is clear that the ALJ did not rely on Plaintiff's ability to travel 70 miles to the hearing as the only reason to discount his credibility.  Contrary to Plaintiff's assertions, a review of the ALJ's written decision reflects that he considered Plaintiff's allegations regarding his

physical limitations and thoroughly explained his reasons for not finding Plaintiff fully credible.

The ALJ accepted Plaintiff's diagnosis of fibromyalgia and concluded that it could reasonably be

expected to produce Plaintiff's pain and symptoms, but that the evidence did support the degree

of limiting effects alleged by Plaintiff.    Substantial evidence supports the ALJ's credibility

assessment. Plaintiff's statements regarding his daily activities are contrary to his allegations of

disabling pain.   The record shows Plaintiff could drive, wash dishes, lift groceries, do laundry,

visit the nursing home several days each week, and mow the grass (Tr. 69, 70, 211-12).

Plaintiff's complaints also contradict his hearing testimony and other evidence in the record.

Plaintiff testified that he did not take daily naps, despite Dr. Thompson's statement that he had to

take naps every four hours. (Tr. 384-88).  Plaintiff testified that he did daily stretching, and used

only Ibuprofen for pain with Vicodin once or twice a week.  Plaintiff's failure to enroll in a pain

management program that was recommended by Dr. Thompson on at least two different

occasions is also evidence to support the ALJ's conclusion[2] (Tr. 342).

The Magistrate Judge recognizes the record clearly shows that Plaintiff suffers from

fibromyalgia and that this impairment causes pain and limitations in Plaintiff's functioning.

---

[2]Plaintiff told Dr. Thompson that he could not afford to enroll in a pain management program.  The Court recognizes that "it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Gordon v. Sec. of Health & Human Servs.*, 725 F.2d 231, 237 (4th Cir. 1984); *Gamble v. Chater*, 68 F.3d 319, 322  (9th Cir. 1995).  And, Social Security Ruling 82-59p provides that an inability to pay for treatment is a good reason for a refusal to follow prescribed treatment.  However, the ruling also states that "the claimant must demonstrate that he has exhausted all free or subsidized sources of treatment and document his financial circumstances before inability to pay will be considered good cause." *Gordon*, 725 F.2d at 237.  In the present case, Plaintiff has not alleged that he looked into the availability of any free or subsidized resources in attempt to pursue pain management.  Nor has Plaintiff alleged an inability to afford a pain management program in his brief before this Court.

However, when there are discrepancies between what a claimant has said and what the written record shows, a reviewing court should not substitute its credibility findings for those of the ALJ.  *See Wagner v. Apfel*, 238 F.3d 426 (6th Cir. 2000); *Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  Based upon the above, the Magistrate Judge concludes that the ALJ did not err in his credibility assessment.  However, the Magistrate Judge notes that he has recommended the ALJ be directed to properly reevaluate Dr. Thompson's opinion on remand, and that a reassessment of Plaintiff's credibility may be required  in light of this reevaluation.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner that Plaintiff was not disabled is not supported by substantial evidence.  Accordingly, the Court recommends the decision of the Commissioner be REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this Report and Recommendation.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: August 4, 2008

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).